UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LISA ANN ACIERNO,

     Plaintiff,

v.                            Case No. 8:24-cv-02470-KKM-NHA

COMMISSIONER OF
SOCIAL SECURITY,

     Defendant.

_____/

## REPORT AND RECOMMENDATIONS

Plaintiff challenges the June 26, 2024 denial of her claim for Disability Insurance Benefits ("DIB"). She argues that four errors in the Administrative Law Judge's ("ALJ") decision warrant reversal. Plaintiff argues that the ALJ erred: (1) by finding that Plaintiff had gained certain skills in her previous employment despite any evidence in the record that she had done so (Doc. 15, pp. 3-6); (2) by finding that Plaintiff could perform certain jobs with skill requirements that the ALJ never assessed (*id.*, pp. 6-9); (3) by improperly ignoring the impact of Plaintiff's "borderline age situation" at the time of the ALJ's decision (*id.*, pp. 9-13); and (4) by failing to either include, or to explain why he omitted, mental limitations from his description of Plaintiff's residual functional capacity, after finding earlier in his opinion that Plaintiff did have certain mild mental limitations (*id.*, pp. 14-25).

After carefully reviewing the parties' briefs and the administrative record, I respectfully recommend that the case be remanded to the Social Security Administration for further proceedings, to allow the ALJ to explain the absence of mental limitations in his residual functional capacity finding.

## I.   Background

### A.  Procedural History

Plaintiff, who was born on August 31, 1969 (R. 232), has a high school education and has worked as a paralegal and a legal secretary. R. 257-58. She applied for DIB on July 18, 2019. R. 232. Plaintiff claimed she had become disabled on June 27, 2019, due to a variety of physical ailments, specifically, multiple lumbar/cervical fusions, spondylolisthesis (or, vertebra displacement) with instability, degenerative disc disease, herniated discs, spinal stenosis (or, a narrowing of the space inside the spine), radiculopathy (or, a pinched nerve in the spinal column), high blood pressure, stomach issues, and chronic pain. R. 256-57. During the DIB application and appeal process, Plaintiff also provided medical records indicating a history of depression (*see, e.g.*, R. 617, 663) and testified that her physical impairments impacted her mental functioning (*see* R. 54 (testifying that her pain made it difficult to focus); R. 301 (reporting that her pain interfered with her memory and attention span); R. 1713 (testifying that her medication made her drowsy)).

2

### 1. First Hearing and Appeal

The Social Security Administration ("SSA") first denied Plaintiff's application for DIB on September 20, 2019 (R. 115), and denied it again after reconsideration on July 15, 2020 (R. 133). Plaintiff then requested a hearing, after which the ALJ found that Plaintiff was not disabled because she was able to perform her prior work. R. 13. Plaintiff appealed that decision to this Court, arguing that the ALJ's decision was erroneous because she "could not perform the lifting and carrying required by her past relevant work as she actually performed it with the limitations adopted by the ALJ." *See Acierno v. Kijakazi*, 8:22-cv-2961, Doc. 13, p. 4. On May 24, 2023, after the Commissioner voluntarily moved to remand the case, this Court remanded the case for further administrative proceedings. R. 1736.

Upon remand, the SSA Appeals Council vacated the Commissioner's prior decision and ordered that the ALJ hold another hearing. R. 1726. The Council directed the ALJ to resolve the inconsistency between his finding that Plaintiff could lift or carry no more than 10 pounds, and his finding that she could perform her past work, which she testified involved lifting up to 20 pounds. *Id.*

### 2. Second Hearing and Appeal

In the second proceeding before the Commissioner, which directly preceded the present appeal, the ALJ conducted another telephonic hearing.

R. 1698. This time, Plaintiff attended with a non-attorney representative. *Id.* Plaintiff and vocational expert ("VE") Suzette Skinner testified. R. 1700, 1717. In the post-hearing decision, issued on June 26, 2024, the ALJ again concluded that Plaintiff was not disabled. R. 4329. This time, the ALJ's decision held that Plaintiff could *not* perform her prior work, but that she was not disabled because she could perform other jobs that existed in significant numbers in the national economy. R. 4343. The ALJ's ruling became a final decision on August 26, 2024, and on October 23, 2024, Plaintiff timely appealed to this Court, seeking reversal of the ALJ's decision. Doc. 1.

The Commissioner has responded to Plaintiff's brief (Doc. 20), and Plaintiff has filed a reply (Doc. 21). The case is now ripe for review.

B. Facts Relevant to Plaintiff's Claims

On appeal, Plaintiff raises four issues, three of which relate to whether the ALJ properly assessed her ability to transfer skills to the eligible jobs he identified. Specifically, Plaintiff first objects to the ALJ's finding that Plaintiff could perform certain jobs: (1) because they require paralegal skills that the ALJ improperly found Plaintiff acquired in her prior work; (2) because, even if Plaintiff had those skills, the jobs identified by the ALJ required additional skills that Plaintiff was never purported to have; and (3) because the ALJ failed to consider Plaintiff's "borderline age situation," which would have precluded a finding that Plaintiff could do new work that required her to develop

4

additional skills. Fourth, and separately, Plaintiff argues on appeal that the ALJ erred by finding that Plaintiff had mild mental limitations but failing to include—or explain the absence of—any associated limitations in Plaintiff's residual functional capacity.

Facts relevant to these claims are below.

1. Facts Relating to Plaintiff's Past Work and Transferrable Skills

In September 2019, Plaintiff reported to the SSA that she had held four positions between 2002 and 2019: two as a "legal assistant," between 2002 and 2010, and two as a "paralegal," between 2010 and 2019. R. 268. She described each of the positions, respectively, as: (1) "emailing, drafting letters, answering phones customer service, heavy computer work, faxing, copying, filing" (R. 269); (2) "emailing, faxing, filing, phone work, customer service, heavy computer work, drafting letters," (R. 270); (3) "emailing, faxing, filing, phone calls, customer service, heavy computer work, drafting letters," (R. 271); (4) "emailing, faxing, filing, phone work, customer service, heavy computer work, drafting letters," (R. 272). For each of the four positions, Plaintiff answered "no" to the question of whether she "use[d] any technical knowledge or skills" for the job. R. 269-72. She answered "yes" to the question of whether each job required her to "do any writing, complete reports, or perform duties like this?" R. 269-72. In a 2020 work report completed by Plaintiff, she reported three past jobs, describing each only as "paralegal." R. 330. In a pre-hearing brief filed by

Plaintiff's attorney before her first ALJ hearing, he described Plaintiff's past work simply as "paralegal." R. 336.

Plaintiff elaborated on her skills and job history at the first ALJ hearing in 2021. Responding to a question from the ALJ about her job in 2006, Plaintiff explained: "That was a large firm, and they would call you quote/unquote a paralegal. I was a legal assistant, they called it, because I wasn't certified. But I did a lot of the work of the paralegals there. I still billed for my time on certain cases. So, there again, I mean, I didn't have the title, but I did the work." R. 40. In response to a question about her job in 2010, Plaintiff elaborated:

> Right. We had relocated to Florida, and same thing there. I was a legal assistant. I mean, we did everything. I had one direct report attorney. And so, I did her paralegal work, you know, drafting, fitting [sic], extracting, discovery. But I also did all her secretarial work, too. So, we didn't really – and same as my next job, it's going to be the same answer pretty much. We didn't have a legal secretary and paralegals in the firm. We just had, you know, one on one and you did it all.
>
> R. 41.

After hearing this testimony, the ALJ asked VE Karen Schneider whether she needed any more information to "classify" Plaintiff's former jobs. R. 42. The VE asked only about the amount of time Plaintiff spent sitting or standing in her prior work. *Id.* Later in the hearing, the VE returned with this description of Plaintiff's past work: "So, I would say she was performing a composite job. And one portion of this would be legal secretary . . . DOT 201.362-010, sedentary, SVP: 6, skilled. And the other portion would be

6

paralegal, DOT 119.267-026, light per DOT, sedentary as performed, SVP: 7, skilled. And that would be it." R. 60-61. The ALJ adopted the VE's testimony in his first decision, issued in 2022, concluding that Plaintiff could perform her past work, which he identified as a composite job consisting of legal secretary and paralegal, and which he found Plaintiff performed at the "sedentary" exertion level, despite the paralegal position being described in the DOT as "light" work. R. 25-26.

Plaintiff later successfully challenged the portion of the ALJ's decision finding that Plaintiff could perform her past work as it was actually performed, arguing that it was inconsistent with the ALJ's finding that she could lift no more than ten pounds. R. 1724-35. As part of Plaintiff's initial appeal to the Appeals Council, Plaintiff's lawyer at the time filed a brief in which he summarized the ALJ's findings of Plaintiff's past work before objecting to the ALJ's conclusion that Plaintiff could perform "light" rather than "sedentary" work. R. 347-48. In his summary of the ALJ's finding that Plaintiff had performed a composite job of paralegal and legal secretary, he added a footnote citing the DOT description of "paralegal" and linking to a website with the full description found in the DOT, starting with a summary stating that a paralegal "researches law, investigates facts." R. 348; *see* https://occupationalinfo.org/11/119267026.html (last accessed January 23,

2026). He did not contest the finding that Plaintiff had performed a composite job that included paralegal functions as defined by the DOT.

At Plaintiff's second hearing in 2024, the same ALJ presided, and Plaintiff and VE Suzette Skinner appeared and testified. Plaintiff explained that in her prior work, "I did all the legal secretary work, and the paralegal work on the files . . . it was a dual role. So you basically just reported to one attorney, and did everything from the very beginning to the very end of the case." R. 1700-01. The ALJ asked "I thought we had discussed, in the prior hearing, that . . . you were certified as a paralegal?" Plaintiff responded: "No. I think that was a misinterpretation of it . . . I never worked as certified because I'm not." R. 1701.

The ALJ ultimately adopted his prior 2022 description of Plaintiff's past work (composite work as a legal secretary and paralegal), modifying it only to note that Plaintiff had performed the job at the "light" exertion level. R. 1703, 4342. The ALJ then asked Ms. Skinner, the VE, whether she had "any kinds of issues with the previously classified past work?" The VE responded that she had "no issues." R. 1717. Plaintiff's representative did not question or challenge the VE's qualifications[1] or characterization of Plaintiff's prior work.

---

[1] Ms. Skinner had a Master of Science degree in Guidance and Counseling, and one in Criminology, and had worked in private practice as a rehabilitative consultant, providing vocational expert testimony, since 2000. R. 1889-90.

Then, the ALJ asked the VE: given the modified description of Plaintiff's prior work (composite job of legal secretary, sedentary, and paralegal, with light exertion), could a hypothetical person with Plaintiff's age and work history, who could only occasionally lift, carry, push, or pull less than ten pounds, could stand or walk for only two hours per workday, could only occasionally climb ramps or stairs, kneel, stoop, crouch, or crawl, but could never climb ladders, and must avoid exposure to wetness, vibrations, hazardous machinery or heights, perform Plaintiff's past work? The VE answered that such a person could not perform Plaintiff's past work. R. 1718.

The ALJ next asked: "would Ms. Acierno have required [sic] any skills from her past skilled work, that would transfer to jobs that sit within this residual functional capacity?" The VE answered: "Yes, Your Honor. She has skills investigating, researching[,] preparing reports, computer reports and correspondence, and keyboarding." R. 1718. The VE testified that these skills would "transfer to" three skilled positions found in the Dictionary of Occupational Titles ("DOT"): legal investigator, DOT 119.267-022; personnel recruiter, DOT 166.267-038; and employee relations specialist, DOT 166.267-042. R. 1718-19. The VE testified that these jobs existed in the national economy in numbers of 6,200, 67,000, and 23,000, respectively. R. 1717-18.

In examining the VE, Plaintiff's representative asked: "And the transferable skills that you identified – they come from the DOT description of

9

the skills that are relevant to what you identified as the past work. Correct?" The VE answered: "Correct, no additional skills." R. 1720. Plaintiff's representative also asked, "is it correct that SSR 82-41 and the Revised Handbook for Analyzing Jobs describes SSA's methods for determining transferability of skills? Correct?" The VE responded: "I believe so. Otherwise, I'd have to look it up again." R. 1721. Plaintiff's representative did not ask any additional questions of the VE regarding Plaintiff's prior work or skillset.

In the decision Plaintiff challenges here, the ALJ adopted the VE's findings as to Plaintiff's prior work and the skills Plaintiff acquired, and the VE's testimony that Plaintiff could perform the three identified jobs, which the ALJ found existed in significant numbers in the national economy. R. 4342-43.

2. Evidence Relating to Plaintiff's Mental Impairments

Plaintiff's medical records illustrate a history of non-debilitating mental health issues. Additionally, Plaintiff testified that she had trouble maintaining her focus, due to her pain and pain treatment.

Records of primary care visits between December 2017 and May 2019 indicate that Plaintiff was treated for anxiety and depression following her daughter's 2017 death. *See* R. 617, 622, 627, 632, 637, 643, 648, 653, 658, 663. One record shows she was prescribed Wellbutrin, an antidepressant, in June 2017 (R. 663), but had stopped using it by May 2018 (R. 643).  In May 2019, the doctor noted that Plaintiff had a Klonopin prescription but barely used it,

10

reporting that she "no longer needs Lexapro at this time," and that she was generally "feeling well." R. 617.

In 2019 and 2020, two state agency psychological consultants completed assessments of Plaintiff's mental impairments by reviewing her records and applying the "psychiatric review technique." In 2019, Dr. Janet Anguas-Keiter, Psy. D., concluded that Plaintiff did have medically determinable impairments within the "depression, bipolar, and related disorders" and the "anxiety and obsessive compulsive disorders" categories, but that these did not lead to any impairments in Plaintiff's understanding, memory, ability to interact, concentration, or ability to adapt and manage herself. R. 84. Dr. Anguas-Keiter noted that Plaintiff appeared to have "more than adequate mental health functioning," and, while Plaintiff did not allege any mental health impairment, she likely had non-severe ones. R. 85. In his 2020 report completed during the first reconsideration of the denial of Plaintiff's DIB application, Dr. Mercedes DeCubas, Ph.D., reached the same conclusions: that Plaintiff had mild impairments relating to depression and anxiety but that they did not cause any practical impairments in her mental functioning. R. 101-02. Dr. Decubas noted his agreement with Dr. Anguas-Keiter's 2019 evaluation and noted that there had not been any documented changes in Plaintiff's mental condition since that time. R. 102.

In a 2020 private "disability examination" performed by Dr. Charles Lebowitz, while Plaintiff was applying for DIB, Dr. Lebowitz noted briefly his impression that Plaintiff had post-traumatic stress disorder relating to the death of her daughter. R. 1211. In the "mental status exam" section, Dr. Lebowitz noted that Plaintiff had no issues with her memory or behavior. R. 1210.

Consistent with Plaintiff's assertion in her DIB application that she was only physically disabled, most of the testimony at both of Plaintiff's hearings before the ALJ focused on her physical ailments. However, Plaintiff briefly addressed mental limitations that resulted from her physical health issues at both hearings. In the 2021 hearing, Plaintiff's attorney asked her whether her chronic pain interfered with her ability to focus while at work, to which Plaintiff responded "Yes. I mean, you can't not [lose focus]." R. 54. Plaintiff also referenced her past Cymbalta prescription in that hearing, describing it as having been prescribed both for "the nerve pain and the depression," but testified that she had discontinued Cymbalta because it was not effective and she "couldn't stay awake." R. 58.

At the 2024 hearing, Plaintiff testified that she could perform daily tasks, despite her mental and physical limitations, stating that she could drive and cook "when I have to." 1711-12. During a discussion of how she spent her free time, Plaintiff's representative asked her whether she had "any difficulties

with reading or watching TV," to which Plaintiff responded, "if anything, it's the attention thing." R. 1713. When asked to elaborate, Plaintiff explained, "I'm taking an opiate . . . And it just – it makes you drowsy . . . it's not necessarily attention. It's just the fact that I'm tired." R. 1713.

Plaintiff also submitted written "function reports" to the SSA in which she discussed how her physical ailments affected her mental functioning. In a 2019 function report, Plaintiff wrote that she was able to manage money-related chores such as paying bills and managing a savings account, but that she could only pay attention for "5 minutes or less" and that she needed to reread written instructions and ask for verbal instructions to be repeated in order to understand them. R. 280, 282. In another function report completed by Plaintiff in 2020, she wrote that her "pain causes issues with memory [and] concentration," such that she "had trouble finishing paperwork [and] projects." R. 301.

C. The ALJ's Decision

After Plaintiff's 2024 hearing, the ALJ issued the decision Plaintiff now appeals. Pursuant to the five-step evaluation process for determining disability status (20 C.F.R. 416.920(a)(4)), the ALJ first found that: (1) Plaintiff had not engaged in substantial gainful activity since her initial DIB application (R. 4334); and (2) Plaintiff had the severe impairments of multilevel degenerative disc disease with radiculopathy and scoliosis (*id.*), and had non-severe

13

impairments of irritable bowel syndrome, headaches, hypertension, hemorrhoids, and posttraumatic stress disorder (R. 4335). The ALJ found that Plaintiff's mental impairments were non-severe because they caused no more than a minimal limitation in Plaintiff's ability to do basic work activities. R. 4335-36. Nonetheless, noting Plaintiff's testimony about occasional difficulties staying on task, the ALJ concluded that Plaintiff had "mild" limitations in the categories of memory/understanding and concentration. R. 4335.

Moving to Steps Three, Four and Five, the ALJ found that: (3) Plaintiff did not have any impairment or combination thereof which met or medically equaled one of the per se disabling impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (R. 4336); (4) Plaintiff could perform sedentary work as defined in 20 C.F.R. 404.1567(a) with several physical and environmental limitations (but no mental limitations) (R. 4337); and (5) Plaintiff could perform jobs that the VE identified which the ALJ found existed in significant numbers in the national economy: the jobs of legal investigator, personnel recruiter, and employee relations specialist. R. 4343.

## II.    Standard of Review and Applicable Law

The Court reviews the ALJ's decision with deference to its factual findings, but no deference to its legal conclusions. *Keeton v. Dep't of Health & Human Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994); *Lewis v. Barnhart*, 285

14

F.3d 1329, 1330 (11th Cir. 2002) ("With respect to the Commissioner's legal conclusions, . . . our review is *de novo*.").

The Court must uphold a determination by the Commissioner that a claimant is not disabled if the determination is supported by substantial evidence and comports with applicable legal standards. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 597 U.S. 97, 103 (2019). Substantial evidence is merely "more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (quoting *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004)). In other words, the Court is not permitted to reweigh the evidence or substitute its own judgment for that of the ALJ, even if the Court finds the evidence preponderates against the ALJ's decision. *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

That said, the ALJ must state the grounds for his decision with enough clarity to enable the Court to conduct meaningful review of the standards he employs. *See Keeton*, 21 F.3d at 1066 (we must reverse when the ALJ has failed to "provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted"); *Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984).

15

In making its decision, the Court must review the entire record. *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992).

## III.    Analysis

Among Plaintiff's four arguments on appeal, I find that only her fourth requires remand. That is, I agree that the ALJ erred by neither including, nor explaining the omission of, mental limitations from his description of Plaintiff's residual functional capacity.

### A.    The ALJ's Finding of Plaintiff's Transferrable Skills is Supported by Substantial Evidence

Plaintiff first argues that the ALJ erred by concluding, without substantial evidence, that Plaintiff had acquired the transferable skills of "investigating" and "researching" in her past work.

At Step Five of his analysis, the ALJ determined that Plaintiff could perform the skilled jobs of legal investigator, personnel recruiter, and employee relations specialist, which jobs exist in substantial number in the national economy.  R. 4342-43. He based this finding, in part, on the VE's testimony that Plaintiff's past work consisted of a composite job of legal secretary and paralegal that "required the following skills: investigating, researching, preparing reports and correspondence, and keyboarding." R. 4342.

Plaintiff argues that the record fails to show that she acquired the skills of investigating and researching. She concedes that the DOT definition of the

16

occupations of legal secretary and of paralegal (which jobs she repeatedly reported performing) include researching and investigating, but she argues that the VE and the ALJ ignored her own description of her prior work in favor of the DOT descriptions, contrary to SSA guidance. Doc. 15, p. 5. Plaintiff argues that, because she never described her past work as jobs involving research or investigation, the ALJ's finding that she had those skills was unsupported by substantial evidence. *Id.*, pp. 5-6. Plaintiff further argues that those skills were necessary to perform all three jobs the ALJ identified for Plaintiff, and thus concludes that the ALJ's errant finding requires remand. *Id.*

In response, Defendant emphasizes that the DOT description of the paralegal position prominently asserts that a paralegal "researches law" and "investigates facts," and the DOT description of legal secretary says that such a worker "may review law journals and other legal publications to identify court decisions pertinent to pending cases." Doc. 20, p. 9 (quoting DOT 119.267-026, 1991 WL 647027 and DOT 201.362-010, 1991 WL 671667). Defendant notes that Plaintiff not only self-identified as a "paralegal" and "legal secretary" in her past work, thus making the DOT descriptions of those jobs relevant to a finding of her skills, but that Plaintiff described her work as "emailing, faxing, filing, phone work, customer service, heavy computer work, drafting letters." Doc. 20, p. 8 (citing R. 269-72). Defendant thus argues that,

17

between the VE's testimony and Plaintiff's own reports of her past work, substantial evidence supports the finding that Plaintiff acquired research and investigation skills in her past work.

When an ALJ determines at Step Four that the claimant cannot perform her past relevant work, the Commissioner must demonstrate that work exists in significant numbers in the national economy that a claimant can perform, given her residual functional capacity and her vocational profile. 20 C.F.R. § 404.1560(c). "The ALJ must articulate specific jobs that the claimant is able to perform, and this finding must be supported by substantial evidence, not mere intuition or conjecture." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002). Crucial to an ALJ's determination of whether a claimant can perform new jobs is an ALJ's finding of the skills the claimant acquired in her past work. *See* 20 C.F.R. § 404.1568(d)(1) ("We consider you to have skills that can be used in other jobs, when the skilled or semi-skilled work activities you did in past work can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work.").

A binding 1982 SSA ruling[2] states: "The claimant is in the best position to describe just what he or she did in [past relevant work], how it was done,

---

[2] "[SSA Rulings] are binding on all components of SSA." 20 C.F.R. § 402.160(b)(1); *see also Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1361 (11th Cir. 2018) ("We require the agency to follow its regulations where failure

what exertion was involved, what skilled or semiskilled work activities were involved, etc. Neither an occupational title by itself nor a skeleton description is sufficient." SSR 82-41, 1982 WL 31389 at * 4.

Here, while Plaintiff never used the words "research" or "investigation" to describe her past work, the ALJ's finding that she had those skills is nevertheless supported by substantial evidence.

Plaintiff repeatedly represented to the ALJ that she was a paralegal. *See, e.g.,* R. 40, 246, 268, 1700. She asserted that two different law firms considered her a paralegal. R. 40-41. She testified that she billed law firm clients for her time (R. 40), as is appropriate for a paralegal, but not a secretary. *Cf. Jean v. Nelson*, 863 F.2d 759, 778 (11th Cir. 1988) ("[P]aralegal time is recoverable as part of a prevailing party's award for attorney's fees and expenses, but only to the extent that the paralegal performs work traditionally done by an attorney.") (cleaned up). Plaintiff testified that she did "all of" the work of both a paralegal and a legal secretary. R. 41. And, while Plaintiff corrected the ALJ's belief that she had earned a paralegal certification, she did so while reasserting that she functionally worked the "dual role" of paralegal and legal secretary which involved "everything from the very beginning to the very end of the case." R. 1700-01. In this context, her broad description of tasks

---

to enforce such regulations would adversely affect substantive rights of individuals.") (cleaned up).

19

such as "extracting," (R. 41) "discovery," (R. 41), "heavy computer work," (R. 269), and completing reports (R. 269-72), were fairly interpreted to include the typical research and investigation done by paralegals.

Moreover, Plaintiff and her representatives had many opportunities to correct the VE's allegedly mistaken impression that her past work required research and investigation, and they never did.[3] Plaintiff was represented at both hearings, and no representative objected to either the characterization of Plaintiff's past work as "paralegal" as it was defined by the DOT, nor to the specific skills the VE associated with that work at the second hearing. In her prior appeal to the Appeals Council, Plaintiff even acknowledged that the composite job she previously performed included paralegal skills, citing to the DOT definition of paralegal, 119.267-026, which prominently lists researching law and investigating facts. R. 348. And in her first appeal to this Court, Plaintiff did not object to the ALJ's finding that she did both the paralegal and

---

[3] I recognize that the Supreme Court has questioned whether SSA hearings before an ALJ, as "non-adversarial" proceedings, ever require "issue exhaustion" before raising an argument in an appeal to a district court. *See Carr v. Saul*, 593 U.S. 83, 97 (2021) (Thomas, J., concurring in part) ("Because [Social Security ALJ] proceedings bear little resemblance to adversarial litigation, I agree with the Court that there is no need for an exhaustion rule."). I do not suggest that Plaintiff waived or forfeited this argument by failing to object to the VE's testimony at the hearing. Indeed, I address it in full. Rather, I find that Plaintiff's failure to object to or correct the VE's reasonable interpretation of her representations supports a finding that the ALJ's adoption of the interpretation was reasonable.

legal secretary jobs, only to the fact that the ALJ failed to acknowledge that she lifted up to 20 pounds in her work as a paralegal and could no longer lift more than 10. *See Acierno I*, 8:22-cv-2961, Doc. 13, p. 3 ("All parties have agreed that Ms. Acierno's past relevant work was a composite job, with significant elements of the occupations of both legal secretary and paralegal.")

Altogether, Plaintiff's own representations support the ALJ's finding that she could perform the paralegal skills of research and investigation. Alternatively, the VE's testimony, alone, could constitute substantial evidence supporting the ALJ's finding. *See Biestek*, 587 U.S. at 105 ("Assuming no demand, a vocational expert's testimony may count as substantial evidence even when unaccompanied by supporting data."); *Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984) (per curiam) (holding that a VE's testimony alone constituted substantial evidence for an ALJ's finding of a claimant's transferable skills).

While a VE "might offer testimony that is so feeble, or contradicted, that it would fail to clear the substantial-evidence bar," *Biestek*, 587 U.S. at 105, given Plaintiff's representations throughout the case, I find the VE's testimony was neither "contradicted" nor "so feeble" as to require departure from the baseline assumption that the VE's testimony comprises substantial evidence. The VE's testimony was not contradicted by Plaintiff at either hearing or by any facts in the record. And certainly, when combined with Plaintiff's own

21

representations about her comprehensive performance of paralegal tasks and her broad description of those tasks, the VE's testimony constitutes substantial evidence for the ALJ's finding as to Plaintiff's transferable skills. I thus find Plaintiff's first argument for remand lacks merit.

B. The ALJ did Not Err in Finding that Plaintiff's Skills would Transfer to the Identified Jobs.

Plaintiff next asserts that the ALJ erred by finding she could perform two of the jobs he identified—personnel recruiter and employee relations specialist—using only the skills acquired in her past work. Doc. 15, p. 6.

The DOT defines a "personnel recruiter" as someone who primarily "seeks out, interviews, screens, and recruits job applicants," including by conducting interviews, performing background checks, arranging for candidate travel, and maintaining employment records. DICOT 166.267-038, 1991 WL 647354. A personnel recruiter also "refers qualified applicants to company hiring personnel for follow-up interview[s]." *Id.*

The DOT description of an "employee relations specialist" is a person whose tasks include interviewing and corresponding with current employees about their "work environment and supervision received," and who explains compliance procedures, meets with management teams, inspects workstations, manages employee benefit plans, and prepares reports on employee attitudes with recommendations for changes. DICOT 166.267-042, 1991 WL 647355.

22

Plaintiff argues that, even assuming the ALJ correctly attributed to Plaintiff the paralegal skills discussed in the previous section, he erred by concluding that Plaintiff could perform these "employment-related" occupations, because they require additional skills that the ALJ never assessed. Doc. 15, p. 6. Plaintiff asserts that the ALJ based her conclusion that Plaintiff could perform these jobs solely on the ALJ's mistaken recollection of the VE's testimony, which the ALJ described as testimony that the jobs could be performed by someone with the Plaintiff's work history "but no additional skills." Doc. 15, p. 8 (citing R. 4343).

Implying that these jobs require a person to hire, fire, and supervise others, Plaintiff argues that "even a cursory glance at the DOT demonstrates that the occupations of personnel recruiter and employee relations specialist would require skills beyond those [she] allegedly acquired," because she "did not supervise other people as a legal secretary/paralegal" and "did not hire and fire employees and was never a lead worker." *Id.*, p. 7.

In response, Defendant argues that the ALJ was justified in relying on the VE's testimony that Plaintiff's skills could transfer to the employment-related positions. Doc. 20, p. 8. Defendant also points out that Plaintiff herself described doing "customer service" in her past work, which is arguably transferable to the employment-related positions. *Id.*, p. 10. Finally, Defendant argues that the overall demands of the employment-related positions are

23

analogous to the "secretarial duties" that Plaintiff, the VE, and the ALJ all ascribed to Plaintiff's past work, and that the positions need not be a "one-to-one match." *Id.*

In deciding at Step Five whether a claimant can perform new jobs, the ALJ must "look at [a claimant's] ability to adjust to other work by considering [her] residual functional capacity and the vocational factors of age, education, and work experience, as appropriate in [her] case." 20 C.F.R. § 404.1560(c). The regulations make clear that skills are more likely to be transferable to jobs with the same or lesser degree of skill, use the same or similar tools, and involve the same or similar processes or services, though "a complete similarity of all these factors is not necessary." SSR 82-41, 1982 WL 31389 at * 5.

Ultimately, transferability of skills to different work is a question for the ALJ, and he may rely on a VE's testimony as substantial evidence of transferability. *See Allen v. Bowen*, 816 F.2d 600, 602 (11th Cir. 1987) ("A vocational expert testified as to the existence of such jobs and to the claimant's ability to adapt his skills to perform them. On the basis of this testimony and the other evidence of record, we find that substantial evidence supports the Secretary's decision.").

Here, the ALJ found that Plaintiff could perform jobs including personnel recruiter and employee relations specialist. In reaching this finding, he noted: "The vocational expert was asked if any occupations exist which could

24

be performed by an individual with the same age, education, past relevant work experience, and residual functional capacity as the claimant, and which require skills acquired in the claimant's past relevant work *but no additional skills*," and determined that she could perform the three jobs. R.4343 (emphasis added).

The ALJ's finding that Plaintiff could perform the employment-related jobs is supported by substantial evidence. First, Plaintiff is mistaken in asserting that a "cursory glance" of the DOT descriptions of the employment-related jobs makes clear that the jobs require skills Plaintiff does not have. Plaintiff points out that she does not have experience hiring and firing employees, nor supervising employees, but the jobs she objects to do not appear to require these skills.[4] The personnel recruiter "*refers* . . . applicants to . . . hiring personnel," but does not hire applicants, and the employee relations specialist inquires into "worker attitudes toward . . . supervision received," but is not described as a supervisor. DICOT 166.267-038 (emphasis added); DICOT 166.267-042.

Second, expert testimony supports the ALJ's conclusion that Plaintiff has the skills to perform the jobs. The VE indeed testified that, based on

---

[4] Plaintiff also states that she "was never a lead worker" (Doc. 15, p. 7), but she indicated on a 2019 work history report that she was a "lead worker" in her most recent paralegal job (R. 269).

Plaintiff's residual functional capacity and vocational profile, Plaintiff could perform the jobs of personnel recruiter and employee relations specialist, as they are defined by the DOT. R. 1718-19. The ALJ's reliance on this testimony is not undermined by Plaintiff's assertion that the *ALJ* did not ask the VE to list jobs "which require skills acquired in the claimant's past relevant work but no additional skills." R. 4343; *see* Doc. 15, p. 8. A review of the record shows that shortly after the VE testified to Plaintiff's skills, *Plaintiff's representative* asked the VE: "And the transferable skills you identified – they come from the DOT description of the skills that are relevant to what you identified as the past work. Correct?" to which the VE answered: "Correct, no additional skills." R. 1720. In this context, the ALJ's interpretation of the VE's answer to the *representative's* question—that the VE identified jobs that required only the skills the VE found necessary to perform Plaintiff's past work and no additional skills—appears an accurate interpretation of the testimony.

Further, the ALJ expressly proffered Plaintiff's age, education, work experience, and functional limitations in his hypothetical question to the VE about what jobs were available to someone like Plaintiff. R. 1717-18. The VE identified three positions and confirmed that, in determining the transferability of Plaintiff's skills, she followed SSR 82-41 (which dictates that the ability to adapt to new work depends on a claimant's past skills, age, and residual functional capacity). R. 1721. Considering the VE's unchallenged

26

expertise in the field, her affirmation that she had followed SSA guidelines in determining transferable skills, and her testimony that the employment-related jobs she identified for Plaintiff required no skills beyond those acquired by Plaintiff, substantial evidence supports the ALJ's adoption of the VE's testimony (R. 4343) about the transferability of Plaintiff's skills to the jobs that he identified.

Even if the ALJ's findings about the employment-related jobs were unsupported, however, this error would not require remand. Plaintiff argues that the ALJ's decision cannot be upheld without affirming his findings about the employment-related jobs, because the additional job he identified for Plaintiff (legal investigator), represented only 6,200 jobs in the national economy. R. 4343. Plaintiff argues "[t]he ALJ made no independent finding that 6,200 legal investigator jobs constituted a significant number of jobs, in itself." Doc. 15, p. 8.

But the ALJ found that Plaintiff had "acquired work skills from past relevant work that are transferable to other occupation*s* with jobs existing in significant numbers in the national economy." R. 4342-43 (emphasis added). The ALJ's reference to "occupations" in the plural, in the section of his opinion identifying the three occupations, is most naturally read as a finding that each of the three occupations has jobs that exist in significant numbers. "Whether there are a significant number of jobs a claimant is able to perform with his

27

limitations is a question of fact to be determined by a judicial officer, i.e., the ALJ." *Viverette v. Comm'r of Soc. Sec.*, 13 F.4th 1309, 1318 (11th Cir. 2021) (cleaned up). Thus, I decline to question the ALJ's finding that the legal investigator job exists in significant numbers in the national economy.

Because the ALJ's finding that Plaintiff could perform the employment-related jobs is supported by substantial evidence, and because the ALJ's finding that jobs available to Plaintiff exist in significant numbers would be undisturbed even without the employment-related jobs, Plaintiff's second argument does not necessitate remand.

C. The ALJ Was Not Required to Discuss Plaintiff's Borderline-Age Situation.

In her third argument, Plaintiff asserts that the ALJ erred by failing to account for her borderline age in the decision. Doc. 15, p. 9.

The SSA provides guidelines for evaluating whether a person can perform new jobs, which guidelines vary, in part, depending on the person's age category. Claimants under 50 years old are placed in the "younger person" age category. 20 C.F.R. § 416.963(c). The next category, called "person closely approaching advanced age," comprises ages 50 to 54. *Id.* § 416.963(d). Claimants aged 55 and older are considered "persons of advanced age." *Id.* § 416.963(e). The guidelines suggest that it is harder for a person to transition into new kinds of work as the person ages. *Id.*

28

At the time the ALJ issued his opinion, Plaintiff was about two months shy of her 55th birthday. *See* R. 39 (Plaintiff born on August 31, 1969); R. 4344 (decision issued June 26, 2024). Plaintiff argues that, because the ALJ never discussed Plaintiff's proximity to the "advanced age" category when the decision was issued, his decision must be reversed. Doc. 15, pp. 10-11. She argues that the ALJ would have been required to conclude that Plaintiff was disabled if he had categorized her as a person of advanced age, and thus the SSA Guidelines required him to discuss that fact in reaching his decision. *Id.*, pp. 11-13.

In response, Defendant argues that an ALJ is only required to consider whether to apply a higher age category if a claimant is within a few months of changing categories *and* placing the claimant in that higher age category would result in a finding that the claimant is disabled. Doc. 20, p. 11. Defendant asserts that, in Plaintiff's case, even if Plaintiff were in the advanced age category, she would still be considered *not* disabled, and thus the ALJ was under no obligation to consider Plaintiff's next age category. *Id.*, p. 12.

I find that the ALJ was not required to discuss Plaintiff's next age category, both because it would not have changed Plaintiff's disability classification under the SSA guidelines, and because the guidelines did not

29

dictate the disability determination in this case. Either of these reasons is sufficient to deny Plaintiff's third claim.

If a claimant is unable to do her prior work, she will be considered disabled unless Defendant can show she can perform other work. 20 C.F.R. § 416.920(a)(4)(v). In cases in which a claimant has exertional limitations (meaning she is limited to either sedentary, light, or medium work), but no other limitations, an ALJ can rely *exclusively* on the rules known as the medical-vocational guidelines, or "grids," to determine whether the claimant can transition to new work. SSR 84-14, 1983 WL 31254 at *3. The grids are a collection of tables that determine whether a claimant is disabled or not disabled based on the claimant's exertional limitations, education, job skills, and age category. *See* 20 C.F.R Pt. 404, Subpt. P, App. 2.

However, many claimants, like Plaintiff, also have non-exertional limitations, such as a limited capacity to maintain their balance, crouch or kneel, tolerate exposure to heat or loud noises, maintain focus, or interact with others. SSR 84-14 at *1. "If nonexertional impairments exist, the ALJ may use Medical–Vocational Guidelines as a framework to evaluate vocational factors, but must also introduce independent evidence, preferably through a vocational expert's testimony, of existence of jobs in the national economy that the claimant can perform." *Wilson*, 284 F.3d at 1227. In other words, "no table rule [or 'grid' rule] applies to direct a conclusion of 'Disabled' or 'Not disabled' where

30

an individual has a nonexertional limitation. In these situations, the table rules are used in conjunction with the definitions and discussions provided in the text of the regulations, as a framework for decisionmaking." SSR 84-14 at *1.

Regardless of whether the grids are being used to direct a finding of disability, or as a "framework" alongside other evidence, an ALJ must determine a claimant's age category to decide which grid rule is applicable. A claimant's age category is important because there is a separate grid rule for each combination of age category, amount of experience, level of education, and exertional limitation. In some cases, a claimant's age category determines whether the grids dictate (or recommend) a disabled or not-disabled finding. If a claimant is in a "borderline age situation," the ALJ must "consider whether to use the older age category" – but only if a claimant is "within a few days to a few months of reaching an older age category, *and using the older age category would result in a determination or decision that [she is] disabled.*" 20 C.F.R. § 416.963(b) (emphasis added).

Here, the ALJ did not err by omitting discussion of Plaintiff's age category, because using Plaintiff's older age category would not have resulted in a finding that she was disabled.

The ALJ noted that a finding of "not disabled" was "appropriate under the framework of Medical-Vocational Rule 201.22 and Rule 201.15." R. 4343.

31

These referenced Rules 201.15 and 201.22, are "grid rules" that apply to different age categories. Rule 201.15 mandates a finding of "not disabled" for claimants ages 45-49 who can do only sedentary work, have a high school education, and have transferable job skills from skilled or semi-skilled work. Rule 201.11 mandates a finding of "not disabled" for claimants ages 50-54 with the same characteristics. The ALJ cited both rules because Plaintiff was 49 years old at her alleged onset of disability, and she was 54 years old at the time of his decision. R. 4342.

Though the ALJ did not explicitly reference it, Rule 201.07 mandates a finding of "not disabled" for claimants in the "advanced age" category with the same characteristics. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2, § 201.07. Thus, even if Plaintiff were in the next age category, the grid would not have suggested a different conclusion. Because the applicable rule in the next age category would not have changed the grids analysis, the ALJ would not have been required to discuss Plaintiff's borderline age, even had he relied exclusively on the grids to find her not disabled. *See Rosado v. Kijakazi,* 2022 WL 611601, at *7 (M.D. Fla. Mar. 2, 2022) ("[A] 'borderline situation' exists where (1) the claimant is 'within a few days to a few months' of the next older age category; and (2) applying the grid rules for that older age category would result in a determination that the claimant is disabled. The ALJ must

32

'consider' whether the next older age category should be used when those two conditions are present.") (citing 20 C.F.R. § 416.963(b)).

Additionally, even if the grids proposed a finding of disability for the advanced age category here, the opinion would not require reversal on this basis. As the Eleventh Circuit recently clarified, an ALJ "could not have erred in failing to consider the borderline age situation" where the ALJ did not rely on the grids to direct a result, "but instead relied on VE testimony due to [the claimant's] non-exertional limitations." *Pupo v. Commissioner*, 17 F.4th 1054, 1062 (11th Cir. 2021).

Just as in *Pupo*, the ALJ in this case correctly used the grids only as a "framework," because Plaintiff had non-exertional limitations: the ALJ limited Plaintiff to sedentary work but also found that Plaintiff had non-exertional limitations, including that she could stand or walk no more than 2 hours per workday, could never climb ladders, ropes or scaffolds, could only occasionally kneel, stoop, or crouch, and had to avoid wetness, vibration, and unprotected heights. R. 4337; *see* 20 C.F.R. § 416.1569a(c)(vi) (providing as examples of non-exertional limitations "difficulty performing the manipulative or postural functions of some work such as reaching, handling, stooping, climbing, crawling, or crouching."). Thus, no matter which grid applied, it would not have dictated whether Plaintiff was disabled. Therefore, the ALJ's choice not to

33

discuss Plaintiff's borderline age would not have required reversal, even were Plaintiff's age category determinative under the grids.

D. The ALJ Erred in Omitting Discussion of Plaintiff's Mild Mental Limitations in his Residual Functional Capacity Assessment.

Finally, and independently of her three objections to the ALJ's Step Five analysis, Plaintiff argues that the ALJ erred by failing to account for his own finding that she had mild mental impairments, when he crafted Plaintiff's residual functional capacity.

The ALJ found in Step Two that Plaintiff had mild limitations in the functional areas of understanding/memory and concentration/persistence. Doc. 15, p. 16. Thus, Plaintiff argues that the ALJ was required to either include functional limitations in Plaintiff's residual functional capacity, or explain why he did not. *Id.*, pp. 16, 22.

In response, Defendant argues that the ALJ did consider Plaintiff's mental limitations in his residual functional capacity analysis by citing approvingly to the two state agency medical opinions that determined that Plaintiff had no mental limitations. Doc. 20, p. 13. Defendant also argues that the ALJ was not required to explicitly consider including Plaintiff's mental limitations in her residual functional capacity, given that he had found her to have only "mild" mental impairments. *Id.*, pp. 12-13.

34

At step 2, if an ALJ finds that a claimant has any mental impairment, the ALJ must evaluate the mental impairment using the Psychiatric Review Technique ("PRT"). 20 C.F.R. §§ 404.1520a, 416.920a. This technique requires an assessment of how the mental impairment impacts four broad functional areas, also referred to as the "paragraph B" criteria: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. *Id.* §§ 404.1520a(c)(3), 416.920a(c)(3).

The ALJ rates the degree of limitation in each of the paragraph B criteria as none, mild, moderate, marked, or extreme. 20 C.F.R. § 404.1520a(c)(4). A "mild" limitation means that a claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is slightly limited." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, F(2)(a).

The PRT analysis is distinct from the residual functional capacity determination. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The degrees of impairment identified in the PRT analysis help the ALJ determine the overall severity of any mental impairment and whether any such impairment comprises a per se disability, while the functional limitations in the residual functional capacity help the ALJ determine the kinds of work that a claimant can perform. *Compare* 20 C.F.R. § 404.1520a, *with* 20 C.F.R. § 404.1545. In

other words, the limitations identified in a PRT analysis "are not an RFC assessment." SSR 96-8P, 1996 WL 374184, at *4.

Compared to the PRT analysis of a claimant's mental limitations, "the mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment." *Id.* The residual functional capacity "must be based on *all* of the relevant evidence in the case record" of a person's limitations caused by their medical impairments, including medical history, daily activity reports, "lay evidence," and reports of "symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Id.* at *5 (emphasis supplied).

Here, the ALJ's seemingly inconsistent findings regarding Plaintiff's mental limitations makes unclear whether he properly conducted the residual functional capacity analysis. This necessitates remand. *See Keeton*, 21 F.3d at 1066 ("The Secretary's failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal.")

The ALJ used the PRT to assess Plaintiff's mental impairments and found that, although Plaintiff had no limitations in two mental functional areas, Plaintiff was mildly limited in her ability to understand, remember, or apply information, and mildly limited in her ability to concentrate, persist, and stay on pace. R. 4335. In finding these mild limitations, the ALJ departed from

36

the findings of Dr. Decubas and Dr. Anguas-Keiter, who concluded that Plaintiff had no limitations in any of the four functional areas.[5] R. 84, 101-02. This departure made clear that he did not find their opinions completely persuasive.

By contrast, the ALJ's only discussion of Plaintiff's mental limitations in his residual functional capacity analysis is a paragraph discussing Drs. Decubas and Anguas-Keiter's opinions as "persuasive" in their findings that Plaintiff had "no difficulties in all the 'paragraph B criteria.'" R. 4341. Thus, the ALJ seemingly adopts and relies on the doctors' opinions to omit mental limitations from Plaintiff's residual functional capacity at Step Four, despite departing from the doctors' opinions to find mild limitations in his Step Two PRT analysis.

So, while the ALJ's omission of mental limitations from the residual functional capacity may have been supported by substantial evidence (such as the doctors' opinions, the Plaintiff's reported daily activities, and the ALJ's observation that Plaintiff "was feeling well and even stopped taking her

---

[5] Drs. Decubas and Anguas-Keiter evaluated Plaintiff's mental limitations based only on her history of mental illness, while the ALJ largely based his findings on Plaintiff's testimony about her "difficulty completing tasks and driving" and her "limitations in completing tasks and maintaining a regular work schedule." R. 4335. Plaintiff always described *these* functional mental limitations, in her testimony and functioning reports, as side effects of her physical impairments rather than consequences of mental health problems.

psychiatric medications" and "her PTSD was noted as being in partial remission," *id.*), he did not state the grounds for his decision with enough clarity to enable the Court to conduct meaningful review of the standards he employed. *See Keeton*, 21 F.3d at 1066; *see also Winschel*, 631 F. 3d at 1180 (reversing finding of no disability because ALJ failed to include or explain his omission of his PRT finding that claimant had moderate mental limitations in the RFC he crafted for the claimant).

Ultimately, given that the PRT and residual functional capacity analyses are distinct inquiries, the ALJ's failure to include any mental limitations in Plaintiff's residual functional capacity is not per se reversible error. But his failure to clearly explain his treatment of those limitations prevents the Court from concluding that he did the "more detailed" analysis of Plaintiff's capacities that the residual functional capacity analysis requires. *See* SSR 96-8P, 1996 WL 374184, at *4; *see also Winschel*, 631 F.3d at 1179 (11th Cir. 2011) ("When the ALJ fails to state with at least some measure of clarity the grounds for his decision, we will decline to affirm simply because some rationale might have supported the ALJ's conclusion.") (cleaned up).

## IV.   Conclusion

For the reasons stated, I respectfully RECOMMEND:

(1)   That the case be remanded to the Social Security Administration for additional proceedings consistent with the findings in this Report and Recommendation; and

(2)   That the Clerk of Court enter judgment in the Plaintiff's favor, terminate any pending motions, and close the case.

REPORTED in Tampa, Florida, on January 28, 2026.

NATALIE HIRT ADAMS
United States Magistrate Judge

### NOTICE TO PARTIES

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. *See* 11th Cir. R. 3-1. To expedite resolution, parties may file a joint notice waiving the 14-day objection period.